**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


MARSHA NICHOLAS,

        Plaintiff,

v.                                 No. 2:17-cv-00361-KRS-GJF


WINDSTREAM COMMUNICATIONS, LLC,

        Defendant.


**ORDER DENYING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

      **THIS MATTER** comes before the Court on Defendant Windstream Communications,

LLC's motion for partial summary judgment on its affirmative defense of failure to mitigate

damages. (Doc. 31). Windstream contends that Nicholas is not entitled to lost wages or benefits

in this employment discrimination case because the undisputed facts establish that Nicholas did

not apply for jobs or otherwise seek employment comparable to her past position with

Windstream as an account executive. Nicholas largely concedes the point, but submits her self-

employment at "Marsha's Vintage and Vogue Boutique," a limited liability company she

established and operates with her husband, and her mental health preclude judgment as a matter

of law. With the consent of the parties to conduct dispositive proceedings, *see* 28 U.S.C. 636(c),

the Court has reviewed the parties' submissions (*see* Docs 31, 40, & 42), examined the record on

summary judgment, and considered the applicable law. Having done so, the Court denies

Windstream's motion.

# FACTS[1]

Nicholas began working for Windstream in 2006 when it purchased Alltel Communications. (Doc. 1, Compl., ¶8). She rose through the ranks from administrative assistant to retail store manager in Carlsbad, New Mexico, to an account executive in 2008. (*Id.*, ¶¶7-10) As of 2009, Nicholas reported to and was supervised by Ed Hernandez. (*Id.*, ¶10; *see also* Doc. 31-1, Pl.'s Dep., at 96). By all accounts, Nicholas was a "rock star" at Windstream, selling 150 to 200 percent of her quota and earning "superior ratings." (Doc. 1, ¶¶ 10-1; Doc. 31-1, at 90). There was an unfortunate downside, however: Hernandez had a temper. He cussed at, yelled at, intimidated, and bullied employees including Nicholas. (Doc. 31-1, at 92).

Over time, Hernandez's behavior became intolerable and, in part, motivated Nicholas to apply for a "small-business" position within the company, away from Hernandez. (Doc. 1, ¶ 13; Doc. 31-1, at 92, 129). Although Windstream offered her the new role, it did not make sense financially. (Doc. 40-1, Pl's Dep., at 82). And Hernandez pleaded with her to stay and promised her a stake in the "West Texas market," including a percentage of every sale. (*Id.*). Nicholas agreed to stay on. (*Id.*, at 84). Despite his assurances, Hernandez did not "stay true to his word." (*Id.*, at 83). Nicholas "did not get any percentage at all . . . and [Hernandez] basically took accounts from [her], [and] reassigned them to other . . . men." (*Id.*).

In late 2015, Nicholas began having health problems, which she attributes to Hernandez. (*Id.*, at 84). For example, Nicholas would "panic when [she] would – we would have . . . team meetings . . . anytime there was an encounter with Ed, [she] would physically find [herself] getting sick" (*Id*). Hernandez:

---

[1] The facts are portrayed in the light most favorable to Nicholas, as the Court must view them at the summary judgment stage of litigation. At times, the Court cites to the complaint. Of course, the complaint is not record evidence for purposes of adjudicating a motion for summary judgment; however, the Court uses the complaint only to supply omitted background information that is *not* material to the ultimate decision.

would curse, he would yell, he would intimidate, he would bully . . . and he did it to [Nicholas], and [she] became fearful. . . . [I]t would literally physically make [Nicholas] sick because [she] never knew if he was going to yell at [her] in front of the team, if he was going to cuss at [her] in front of the team, how he was going to approach it, but [Nichoals] knew that [she] was next on the list.

(*Id.*, at 92).  Nicholas felt "targeted" and "harassed" by Hernandez, and when she travelled "somewhere . . . [she'd] have to call her husband to pick [her] up because [she] was sick." (*Id.* at 90, 93).  Nicholas resigned from Windstream on June 2, 2016 "when [her] family became very concerned about [her] health" and when it became apparent [Hernandez] would continue to lie and set [her] up for failure and [she] would not succeed in her position."  (*Id*, at 91:25 – 94:15).

After separating from Windstream, Nicholas did not apply for jobs. (Doc. 31-1, at 128-130).  She asked a friend about jobs at "TDS" in Hobbs, but concluded "there was not any positions available in what [she] was trained to do."  (Doc. 40-1, Pl.'s Dep., at 131).  Since resigning, however, "account executive and sales positions comparable to [] Nicholas' position at Windstream are and have been available in the relevant market[.]" (Doc. 31-1, Toney Decl., ¶ 9).  Additionally, "Nicholas retains the requisite skills, training, education and work experience necessary to return to the workplace in the usual and customary occupations she has had in the past, earning a wage comparable to what she earned at Windstream."  (*Id.*).

Nicholas opened "Marsha's Vintage & Vogue Boutique" in October 2016 with her husband.  (Doc. 31-1, Pl.'s Dep., at 8). The boutique started off mostly selling antiques but the focus later became women's clothing.  (*Id*. at 9). The store does not have a payroll and Nicholas does not earn a certain income, but Nicholas and her husband keep whatever money remains after bills and purchasing inventory. (*Id.*, at 12). The shop was not profitable in 2016. (Doc. 42-1, Schedule C (Form 1040)).

Nicholas typically spends eight hours each day at the business.  (Doc. 31-1, at 9).  Nicholas' husband estimates she works at least 50 to 60 hours each week there. (Doc. 40-2, Joe

Nicholas Dep., at 33). At times, Nicholas has closed the shop when her husband cannot stay and takes her to the doctor, or when her son is in school, but endeavors to keep regular hours: Tuesday through Friday from 10 a.m. to 5 p.m. and on Saturday from 10 a.m. to 2 p.m. (Doc. 40-1, at 14). The boutique gives Nicholas a sense of "security" and "safety." (*Id.*, at 131). The work allows her to go in the back and lay down. Nicholas hopes the boutique will prosper and she will not have to seek other jobs. (*Id.*).

## PROCEDURAL BACKGROUND

Nicholas commenced this action on March 27, 2017. (Doc. 1). In her four-count complaint, Nicholas alleges multiple violations of Title VII of the Civil Rights Act: Windstream created and subjected Nicholas to a hostile work environment (Count I); Windstream engaged in disparate treatment of Nicholas because she is female (Count II); Windstream retaliated against Nicholas after she complained to supervisory employees in human resources (Count III); and the retaliation resulted in a materially adverse employment action (Count IV). (Doc. 1, Compl., ¶¶ 22-29). Nicholas seeks compensatory and punitive damages, prejudgment interest, and attorney fees and costs. (*See id.*). On February 12, 2018, the Court dismissed Count III with prejudice after the parties consented to the entry of summary judgment on Nicholas' claim of retaliation. (Doc. 41). Windstream's motion for partial summary judgment on lost wages followed.

## STANDARD

Under Federal Rule of Civil Procedure 56, the Court must enter summary judgment where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks

omitted).  Once the movant crosses this threshold, the non-movant  must establish with record evidence the existence of a genuine issue of material fact for trial on the merits.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  If the non-movant is unable to meet this burden, judgment as a matter of law is appropriate.  *See id.*

## ANALYSIS

Title VII of Civil Rights Act proscribes discrimination, *inter alia,* on the basis of sex. 42 U.S.C. § 2000e-2(1).  The statute's primary purpose is to end workplace discrimination, "[b]ut when unlawful discrimination does occur, Title VII . . . compensate[s] the victims for their injuries" by restoring victims to "where they would have been" absent the discrimination.  *Ford Motor Co. v. EEOC*, 458 U.S. 219, 230 (1992) (citation and internal alterations and quotation marks omitted). To that end, Title VII empowers a court to award backpay, front pay, and compensatory and punitive damages.  Backpay compensates for wages lost between the time of termination and judgment.  *See Daniel v. Loveridge*, 32 F.3d 1472, 1477 (10th Cir. 1994).  Front pay covers future-earnings loss from the time of judgment forward. *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1278 (10th Cir. 1988).  Compensatory damages include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 253-54 (1994) (citation omitted).  Finally, punitive damages are available where an employer acts with malice or reckless disregard for an employee's rights.  *Id.*  As in most civil cases, a plaintiff has a duty to mitigate damages in a Title VII action.  *See* 42 U.S.C. § 2000e-5(g)(1).

Since lost wages are subsumed with the concept of backpay in Title VII cases, the Court construes Windstream as seeking judgment as a matter of law only as to that that category of

damages.[2]  Because failure to mitigate is an affirmative defense, Windstream must initially and ultimately demonstrate that there is no material fact at issue to obtain summary judgment.  *See Celotex Corp. v Catrett*, 477 U.S. 317, 331 (1986).

## Backpay

Consistent with its burden on summary judgment, Windstream "must establish (1) that the damage suffered by [Nicholas] could have been avoided, i.e. that there were suitable positions available which [Nicholas] could have discovered and for which [s]he was qualified; and (2) that [Nicholas] failed to use reasonable care and diligence in seeking such a position."[3] *Equal Opportunity Commission v. Sandia Corp*., 639 F.2d 600, 627(10th Cir. 1980) (citation and internal quotations omitted).  "Suitable" or comparable employment "affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the . . . claimant has been discriminatorily terminated." *EEOC v. W. Trading Co.*, 291 F.R.D. 615, 620 (D. Colo. 2013) (quoting *Sellers v. Delgado Comm. College*, 839 F.2d 1132, 1138 (5th Cir. 1988)).

A plaintiff's duty to mitigate under Title VII is easily satisfied; she need only make "an honest good faith effort" as shown through "reasonable exertions." *United States v. Lee Way Motor Freight*, 625 F.2d 918, 937 (10th Cir. 1979).  The plaintiff "is not held to the highest

---

[2]Arguably, Windstream's motion could include front pay as lost wages. In her response, Nicholas points out that front pay may not be foreclosed by a failure to mitigate defense. Because Windstream has the duty of informing "with particularity the Court of the basis of its motion and citing and applying law in support of its requests for relief," D.N.M.LR-Civ. 7.1 when combined with the fact Windstream's motion and reply do not mention front pay as a concept or refute Nicholas' contention about front pay, the Court will consider lost wages only in the backpay context.

[3] Windstream contends that it need not show the existence of comparable jobs because Nicholas did not apply for any jobs at all and effectively withdrew from the market. Although some courts from outside the Tenth Circuit have embraced a "withdrawal" theory of mitigation, the Tenth Circuit has not done so and has signaled it would not adopt such a test. *See Goodman v. Fort Howard Corp*., 1994 U.S. App. LEXIS 17507, 1994 WL 371528, *4 (10th Cir. July 18, 1994) (employer did not meet burden of showing that employee failed to mitigate damages because employer failed to produce any evidence indicating the existence of suitable positions which employee could have discovered and for which he was qualified; evidence of employee's withdrawal from job market and status as a full-time student is irrelevant).  The Court does not consider Windstream's contention further.

standards of diligence" and success in finding and new job is not required. *See id.* Here, Windstream presents the declaration of a vocational expert attesting to the existence of comparable employment and Nicholas' deposition testimony that that she did not apply for any job. Nicholas does not seriously contest these material facts, but asserts that her self-employment and mental health issues preclude judgment as a matter of law.[4]

### *Self-employment as a form of mitigation*

Although the Tenth Circuit has not considered starting a business in the context of Title VII's duty to mitigate, most courts have concluded self-employment counts "as long as the self-employment [is] a reasonable alternative to finding other comparable employment." *Teichgraeber v. Memorial Union Corp.*, 932 F. Supp. 1263, 1266 (D. Kan. 1996); *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 438 (7th Cir. 1992). Windstream dismisses Marsha's Vintage & Vogue Boutique as insufficient mitigation because the company is "completely different" from Windstream's telecommunications business and Nicholas' compensation at the store is not substantially similar to her past remuneration as an account executive.

---

[4]In response to Windstream's "Undisputed Fact 5," Nicholas says she "had a reasonable belief that she was not qualified for job openings at the time she was forced to resign her employment with Defendant." (Doc. 40, Pl.'s Resp. Mot. Summ. J. at 3). This purported fact does not create a genuine issue for resolution at trial. Nicholas' belief does not controvert properly supported evidence that jobs existed for which she qualified. Moreover, in context, the portion of her own deposition Nicholas cites shows that she asked a friend about a position in Hobbs with TDS and learned there "was [sic] not any positions available in what I was trained to do." (Doc. 40-1, 130-31). Even if Nicholas' "reasonable belief" had any relevance to the mitigation analysis, her actual belief appears to relate to one instance where she asked a friend about potential jobs and with one specific employer.

Nicholas also argues that mitigation is a fact issue reserved for the jury. The Court agrees that mitigation is a fact issue, but disagrees with Nicholas' implication that because an element of a cause of action or affirmative defense is usually reserved for the trier of fact, the summary judgement analysis is different. Regardless of the nomenclature used in the case law, if a defendant shows the absence of an issue of fact for the jury to resolve and the plaintiff does not rebut that showing, summary judgment is mandatory. Nicholas also states that Title VII allows the Court to reduce a backpay award, but not eliminate it altogether. Beyond quoting the statute, Nicholas does not offer any support and the Court did not find any. To the contrary, the Supreme Court has held, for example, if a plaintiff unreasonably refuses an unconditional offer to return to work, an employer's liability for back pay ceases. *See Ford Motor Co.*, 458 U.S. at 234 (explaining that a plaintiff "forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied").

Windstream's analysis is not persuasive.  Self-employment often is a reasonable alternative to a conventional job search even where new the venture is unrelated to a former employer's operations and is not profitable.[5]  *See Brown v. Smith*, 827 F.3d 609, 616 (7th Cir. 2016) (self-employment reasonable despite lack of success); *Jackson v. Host Int'l, Inc.*, 426 F. App'x 215, 222-23 (5th Cir. 2011) (self-employment reasonable where after unsuccessfully searching for employment, plaintiff opened a business that did not profit); *Coronet Foods v. NLRB*, 158 F.3d 782, 801 (4th Cir. 1998) (self-employment and work in other industries reasonable forms of mitigation); *Poff v. Prime Care Med., Inc.*, 2015 U.S. Dist. LEXIS 133682, at *13 (M.D. Pa. Oct. 1, 2015) (self-employment selling items online and opening a roofing business reasonable despite past work as a nurse);  *Newcomb v. Corinth Sch. Dist.*, 2015 U.S. Dist. LEXIS 41700, at *26 (N.D. Miss. Mar. 31, 2015) (a change from custodial work to starting an air-conditioner repair business reasonable);  *Serricchio v. Wachovia Sec., LLC*, 606 F. Supp. 2d 256, 264 (D. Conn. 2009) (opening a tanning salon reasonable despite past work in banking industry and where salon was not immediately lucrative).

Contrary to Windstream's position, the inquiry focuses more on the effort the plaintiff devotes to her business as opposed to profitability of the new enterprise and its similarity to past work.  *See Hansard v. Pepsi-Cola Metro. Bottling Co.*, 856 F.2d 1461 (5th Cir. 1998) (concluding that self-employment was not reasonable because the "business was never more than a part-time enterprise" and consisted of the plaintiff gathering" odds and ends from his home and

___

[5] By contrast, it is usually where the plaintiff does not devote her full attention to the new business that courts have rejected self-employment as mitigation.  *See Hansard v. Pepsi-Cola Metro. Bottling Co.*, 856 F.2d 1461 (5th Cir. 1998) (concluding that self-employment was not reasonable because the "business was never more than a part-time enterprise" and consisted of the plaintiff gathering" odds and ends from his home and s[elling] them"; *Coleman v. Lane*, 949 F. Supp. 604, 612 (N.D. Ill. 1996) (finding no mitigation where "there is no evidence here that Plaintiff made any serious attempts to form or market his own business").  Consequently, Windstream is not entitled to summary judgment simply because the boutique Nicholas established is not yet profitable or is a different type of sales than she did as an account executive.  Taking the facts in the light most favorable to Nicholas, she devotes more 50 to 60 hours each week to running the business, endeavors to keep regular business hours from Tuesday to Saturday, and runs the business from a building she has purchased.

s[elling] them"; *Coleman v. Lane*, 949 F. Supp. 604, 612 (N.D. Ill. 1996) (finding no mitigation where "there is no evidence . . . that Plaintiff made any serious attempts to form or market his own business").   Taking the facts in the light most favorable to Nicholas, she devotes more 50 to 60 hours each week to running the business, endeavors to keep regular business hours from Tuesday to Saturday, and operates the business from a building she has purchased.

The Court recognizes that in several cases where starting a business was held to be a reasonable alternative, the plaintiff pointed to past, unsuccessful attempts to secure comparable work or the record established a nexus between the skills utilized in self-employment and previous job duties. *See Brown*, 827 F.3d at 616 (finding hauling trailers reasonably related to past employment working for municipal public transportation); *Host*, 426 Fed. App'x at 222-23 (plaintiff first tried to find a comparable job); *Coronet*, 158 F.3d at 801 (part-time self-employment combined with multiple applications for work in a different industry);  *Williams v. Imperial Eastman Acquisition Corp.*, 994 F. Supp. 926, 932 (N.D. Ill. 1998) (rejecting self-employment as a reasonable alternative where, after making two inquiries at companies, the plaintiff returned home to operate a cattle farm and holding that "running a cattle farm is totally unrelated to [the past position], drawing on none of [those] skills").

Windstream presents uncontested evidence that Nicholas did not apply for comparable positions at all.  As far as the Court can discern, Nicholas made a single inquiry into employment before starting an antique shop and clothing store approximately four months after she left Windstream.  Even assuming that asking a friend about available jobs should be discounted in the mitigation analysis, Windstream overlooks the reasonable inference that Nicholas moved from one sales job to another.  While there may well be differences between selling clothing at a boutique and sales as an account executive for a telecommunications company, Windstream's reliance on an unsupported statement to that effect in its reply brief does not carry its burden on

summary judgement to show, as a matter of law those differences are so material that she did not meet the law's relatively low standard for diligence.[6]  The Court therefore concludes that a genuine issue of material fact precludes judgement as matter of law on Windstream's affirmative defense of failure to mitigate.

### *Disability as excusing mitigation*

Notwithstanding the conclusion above, the Court disagrees with Nicholas that her self-diagnosed mental health issues excuse mitigation.  Although the Tenth Circuit has not addressed such an argument, a psychological disability *caused* by the employer's discrimination that prevents an employee from mitigating losses ordinarily does not foreclose an award of backpay. *See Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 384 (1st Cir. 2004); *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 141 (1st Cir. 2009).  In *Johnson*, the First Circuit analyzed an employee's claim that he did not seek further employment of a total psychological disability caused by his former employer's unlawful harassment.  The court recognized that an employer-caused inability to work obviated the need to mitigate, but rejected expert testimony establishing only some relationship between the harassment and the disability as creating a genuine issue of material fact. *Id.*  In concluding that the summary judgment was appropriate, the court explained the plaintiff's "own testimony does not bridge the gap," because "he did not, and could not (owing to his lack of expertise), testify that his inability to get a job . . . was caused by the harassment at [his past job]." *Id.*

In this case, Nicholas testified that she would become anxious when traveling and would get "physically" sick when she had an "encounter" with Hernandez. (Doc. 40-1, at 84).  When

---

[6] There may be an argument that Nicholas is precluded from obtaining backpay from the time of separation from employment to the time she started her business.  To the extent Windstream makes that argument, the Court disagrees.  There is likely always some reasonable period of time for a former employee to being a job search, and Windstream offers no evidence from its expert that the four month period at issue here is an unreasonable period of time.

she was on the road, her husband would have to pick her up.  (*Id.*). Hernandez would "cuss, he would yell, he would intimidate, he would bully[.]" (*Id.*).  Nicholas got sick because she never knew if Hernandez was going to bully her, yell or cuss at her in front of the team; she "felt like . . . [she] was being harassed" and "targeted" (*Id.*, at  90-92).  Nicholas put up with "it . . . until [she] became physically sick" (*Id.*, at 111).  The primary reason why she could not apply for another job was "mostly" because she could not work every day as a result of or her anxiety but also because she did not have a college education."   Even if believed, this testimony does not establish that discrimination cognizable under Title VII caused a disabling condition.  *See Morris v. City of Colorado Springs*, 666 F.3d 654, 664-65 (10th Cir. 2012) (stating that Title VII does not establish "a general civility code," for the workplace); *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir. 1998) (explaining that "the plaintiff must produce evidence that she was the object of harassment because of her gender").

In the light most favorable to Nicholas, the record suggests Hernandez's hostility caused some anxiety or physical sickness that Nicholas said was *a* reason she could not apply for work, aside from not having a college education.   Otherwise, Nicholas testified she spends eight-hour days at the boutique.  Her husband estimated the number Nicholas was at the business 50 to 60 hours per week.  Even accepting Nicholas' contention that she needs a chance to rest, and self-employment may allow her naptime, it is unclear how Nicholas is disabled and precluded from future, comparable employment at all.  Finally, Nicholas is not an expert capable of testifying to a disability caused by Windstream *and* that prevents her from looking for comparable employment. *See Johnson*, 364 F.3d at 384 (explaining that the plaintiff's "own testimony" could not "bridge the gap" to survive judgment as a matter of law because the plaintiff lacked the expertise to testify to causation).  The therefore Court rejects Nicholas' argument she was excused from mitigation because of an employer-caused disability.

## CONCLUSION

For the reasons stated above, although Nicholas was not excused from mitigation because of a psychological disability, Windstream did not carry its burden to show Nicholas' decision to open a business selling clothes and antiques was an unreasonable alternative to pursing comparable employment.

**IT IS, THEREFORE, ORDERED** that Windstream's motion for partial summary judgment (Doc. 31) is **DENIED.**

_____
KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent